**Malcolm MOULTON, Plaintiff–Appellant (08–2311),**

**Ron Anderson, Lead putative class member, et al., Movants–Appellants (08–2312),**

**Oundra Stanley, et al., Plaintiffs–Appellees,**

v.

**UNITED STATES STEEL CORPORATION, Defendant–Appellee.**

Nos. 08–2311, 08–2312.

United States Court of Appeals, Sixth Circuit.

Argued: Aug. 4, 2009.

Decided and Filed: Sept. 22, 2009.

346

**ARGUED:** James P. Murphy, Berry Moorman P.C., Detroit, Michigan, for Appellants. J. Van Carson, Squire, Sanders & Dempsey L.L.P., Cleveland, Ohio, Peter W. Macuga, II, Macuga, Liddle & Dubin, Detroit, Michigan, for Appellees. Donnelly W. Hadden, Donnelly W. Hadden, P.C., Ann Arbor, Michigan, for Movants **ON BRIEF:** James P. Murphy, Richard R. Zmijewski, Sr., Berry Moorman P.C., Detroit, Michigan, for Appellants. J. Van Carson, Lianne Mantione, John D. Lazzaretti, Squire, Sanders & Dempsey L.L.P., Cleveland, Ohio, Peter W. Macuga, II, Macuga, Liddle & Dubin, Detroit, Michigan, Jason J. Thompson, Sommers Schwartz, Southfield, Michigan, William J. McKim, United States Steel Corporation Law Department, Pittsburgh, Pennsylvania, Jack O. Kalmink, Clark Hill PLC, Detroit, Michigan, for Appellees. Donnelly W. Hadden, Donnelly W. Hadden, P.C., Ann Arbor, Michigan, for Movants.

Before: CLAY and SUTTON, Circuit Judges; THAPAR, District Judge.*

* The Honorable Amul R. Thapar, United States District Judge for the Eastern District of Kentucky, sitting by designation.

## OPINION

SUTTON, Circuit Judge.

Malcolm Moulton challenges the district court's approval of a settlement agreement arising from a class action filed by the neighbors of a steel mill owned by United States Steel Corporation. A group of other class members, led by Ron Anderson, join Moulton's objections, and separately challenge the district court's management of the opt-out process and its handling of attorney Donnelly Hadden's attempts to represent them. We affirm, except with respect to the district court's approval of the attorney's fee award, which we vacate and remand for further explanation.

### I.

In 2003, U.S. Steel purchased a steel mill bordering Ecorse and River Rouge, Michigan. At the time, the mill's pollution-control equipment was in disrepair. After purchasing the mill, the company spent $65 million to upgrade the old pollution-control equipment and to buy new equipment.

About a year after the purchase, several residents of Ecorse and River Rouge filed a class-action lawsuit against the company. The final amended complaint, filed in 2006, named seven residents as plaintiffs: Oundra Stanley, Malcolm Moulton, Karen Ward, Charles Hunter, Betty Compton, Marcia Brown and Tansley Ann Clarkson. The plaintiffs raised several tort and statutory claims, all to the effect that the mill wrongfully discharged harmful "metal-like dust and flakes" that settled on their real and personal property. ROA 1070.

In March 2006, the district court certified a class that included all individuals owning property or residing in River Rouge and Ecorse at any point after U.S. Steel purchased the mill. The certification order designated Jason Thompson and Pe-

ter Macuga, the attorneys who filed the final amended complaint, as Class Counsel.

Several weeks after the court certified the class, but before it had approved a method for notifying class members, attorney Donnelly Hadden sent a letter to "All River Rouge & Ecorse Clients" regarding the "Suit Against U.S. Steel." ROA 1118. It is not clear on this record how many individuals received the letter or how many class members, if any, had previously retained Hadden to represent them in the lawsuit. The letter says that Hadden had been meeting with residents of the two cities about the litigation, and encourages its recipients to exclude themselves from the class, advising that doing so would be "the best choice for everyone," because "people who 'opt out' ... always get a much higher settlement than ... the general population." *Id.* To *remain* in the class, Hadden instructed, recipients had to complete an attached form and return it to Hadden's office by April 10, 2006. *Id.* Hadden pledged to "opt out" any recipient who did not return the form. *Id.* Either way, the letter concluded, Hadden would "continue to be [the recipients'] lawyer[ ], whether [they] choose to stay in the class or opt out." *Id.* It appears that neither U.S. Steel nor Class Counsel learned of Hadden's initiative until April 14, 2006, when U.S. Steel received a letter from Hadden listing the individuals he claimed to represent and purporting to place an attorney's lien on any settlement proceeds.

The court approved an official notice procedure about two months after Hadden sent his letter. The court required Class Counsel to send each class member an "opt-out" form, which instructed class members who did not want to participate in the suit to sign the form and return it to Class Counsel by July 7, 2006.

As the opt-out deadline approached, Hadden moved to enter an appearance as

counsel for 171 class members who purportedly had signed retainer agreements with him. Two days before the deadline, Hadden filed a motion on behalf of still more class members. Claiming that "583 members of the class" had retained him and told him "they want to be excluded from the class" (presumably by not returning the form Hadden sent them), he asked for leave to file a collective, attorney-signed opt-out form. ROA 1144. The opt-out deadline passed without a ruling on any of the motions.

In August 2006, the court denied Hadden's motions, finding them "procedurally improper" because "Hadden is not counsel of record in this case." ROA 1310. At the same time, it created a new opt-out period for the class members whom Hadden purported to represent. Hadden's clients could still opt out of the suit, the court instructed, but only by submitting an individually signed opt-out form, as opposed to one signed only by Hadden. Once the extended opt-out period closed, the order permitted Hadden to "take appropriate action with respect to those persons who have opted out and who[m] he represents." ROA 1310–11. At the end of this second opt-out period, Class Counsel submitted a final report tallying the number of individuals who had declined to participate in the suit.

The dispute over Hadden's role was a sideshow to the main events—extensive discovery, motions practice and eventually a proposed settlement agreement. In June 2008, nearly four years after the initial complaint and after months of negotiation, Class Counsel and U.S. Steel filed a joint motion for preliminary approval of a $4.45 million settlement agreement. Class representatives Karen Ward and Malcolm Moulton objected to initial versions of the agreement, arguing (among other things) that the agreement allocated

too much money to Class Counsel's fees, and that the agreement's release—which discharged claims arising from pollution emanating from the mill both "prior to" the agreement and "in the future," ROA 1758—was too broad.

The parties eventually narrowed the scope of the release. Rather than releasing all claims for future emissions, the final version of the release discharged continuing-nuisance claims relating to pollutants emitted "at any time up to and including" the agreement's execution date. ROA 1987. In addition, the final version released:

> [Claims for] [a]ll alleged damages, past, present, or future ... under any theory of continuing nuisance, arising out of or relating to the maintenance of any structures, any acts, any operations, or any conditions that existed, began, or were initiated [at the mill] prior to the Settlement Effective Date and that continue for an indefinite period of time, [including pollutants] emanating from [the mill] prior to the Settlement Effective Date or during all periods of time that any such structures, any such acts, any such operations, or any such conditions continue. ROA 1987–88.

The release contained several exceptions. It did not bar "claims based solely on a future catastrophic [event]." ROA 1988. Nor did it preclude "claims based solely on future operations by [U.S. Steel] that (i) involve substantially different manufacturing processes and (ii) result in substantially different or greater air emissions, releases, or odors than current or historical operations." *Id.*

Moulton and Ward again objected, claiming that the agreement unfairly released "any claims that occur in the future." ROA 1760. Attorney Hadden, acting on behalf of his clients, added objections of his own. In addition to ob-

jecting to the size of the settlement and the scope of the release, Hadden alleged that 34 class members had not been included in the final opt-out report due to clerical error, making it necessary to create another opt-out period for class members.

After a final fairness hearing, at which Hadden and Moulton voiced their objections, the court approved the settlement agreement. In a separate order, the court addressed each objection, finding that none supported rejecting the settlement agreement.

## II.

■. On appeal, Moulton and Hadden first argue—together—that the settlement agreement is not "fair, reasonable, and adequate." Fed.R.Civ.P. 23(e)(2). To determine whether a settlement agreement satisfies Rule 23's fairness standard, we consider: "(1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest." *UAW v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir.2007). Moulton and Hadden submit (1) that the agreement disserves the "public interest" due to the broad scope of the release, (2) that "collusion" between Class Counsel and U.S. Steel tarnished the agreement and (3) that the agreement improperly prioritizes the distribution of the settlement proceeds. We review the district court's contrary conclusions for abuse of discretion. *Id.* at 625.

## A.

■ The objectors charge that the release of the continuing-nuisance claims is unfair because the complaint contained no such claims and at a minimum the scope of the release goes "well beyond the claims pled in the complaint." Moulton Br. 27. Since 2005, however, every version of the plaintiffs' complaint—three versions in total—included a claim for "continuing private nuisance." ROA 849, 874, 1090. Having expressly raised a continuing-nuisance claim in each version of the complaint, the objectors are the last individuals in a position to claim lack of notice that this claim was on the table at the settlement talks. Nor can they tenably argue that the release goes beyond these claims. The question is not whether the definition of the claim in the complaint and the definition of the claim in the release overlap perfectly; it is whether the released claims share a "factual predicate" with "the claims pled in the complaint." *Olden v. Gardner*, 294 Fed.Appx. 210, 220 (6th Cir. 2008). That is true here, just as it was in *Olden*. *See also Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 376–77, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996) (construing Delaware law); *TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982); *Williams v. Gen. Elec. Capital Auto. Lease, Inc.*, 159 F.3d 266, 273–74 (7th Cir.1998).

The objectors add that the release of continuing-nuisance claims amounts to a disguised—and unconscionable—release of future tort claims. The release prohibits class members from raising continuing-nuisance claims if they "aris[e] out of or relat[e] to the maintenance of any structures ... acts ... operations ... or ... conditions that existed, began, or were initiated at [the mill] prior to the Settlement Effective Date and that continue for an indefinite period of time." ROA 1987–88. As the objectors read the release, it gives U.S. Steel a free pass to pollute however it would like, because, absent one excep-

tion—for "future catastrophic" events, ROA 1988—it forever bars class members from suing for property damage on a theory of continuing nuisance.

We do not read the release that broadly. The bar on future continuing-nuisance claims applies only to claims arising out of conditions that existed prior to the settlement. It does not preclude future continuing-nuisance claims based on emissions from *new* equipment installed after the date of settlement. Nor does it bar future claims based on old equipment, so long as the continuing nuisance is a "new" one, so long in other words as the nuisance did not begin (and did not begin "continuing") until after the settlement's effective date. By releasing future claims only for pre-settlement conduct, the agreement sensibly—and reasonably—accommodates U.S. Steel's interest in protecting itself from suits based on identical claims that existed at the time of the complaint (and settlement) without extinguishing the class's right to file distinct claims in the future.

The objectors persist that much of the mill's equipment is old and that, notwithstanding U.S. Steel's recent $65 million investment in pollution control, a palpable risk of further pollution exists in the future, particularly as the new pollution controls age. At that point, even under our reading, class members seeking recovery for future property damage will have to show that the mill's emissions are a "new continuing nuisance," not a nuisance that existed pre-settlement, was abated with the new pollution controls and gradually worsened. The exceptions to the release, the objectors warn, would not help much in this situation, because they extend only to "future catastrophic" events or "claims based solely on future operations ... that both (i) involve substantially different manufacturing processes and (ii) result in substantially different or greater air emis-sions, releases or odors than current or historical operations." ROA 1988. And because neither the steel-manufacturing process nor the pollutants it emits is likely to change materially from year to year, it may prove difficult to establish that a future claim is based on "substantially different" conduct.

Even if this is true, it does not establish that the scope of the release disserves the public interest by removing all future incentives for U.S. Steel to maintain their equipment and limit toxic emissions. The steel company, keep in mind, remains subject to the regulation of two sovereigns—Michigan and the United States—which have enacted extensive environmental laws and regulations and which have sophisticated agencies devoted to ensuring compliance with them. In addition to permitting claims for "new" continuing nuisances, the settlement agreement says nothing about—and thus does not restrict—future enforcement actions based on statutory violations. Not just the federal and state agencies may enforce these laws; so too may the class members (and other individuals): They may act as private attorneys general to enforce the Clean Air Act, by reporting suspected violations to the EPA and by bringing a citizen suit if the federal and state authorities fail to address their allegations, *see* 42 U.S.C. § 7604, or they may sue for declaratory and equitable relief to enforce the Michigan Environmental Protection Act, *see* Mich. Comp. Laws § 324.1701.

The district court did not abuse its discretion in approving this release. The release is not as far-reaching as the objectors perceive, and it is not unfair, unreasonable or inadequate. *See* Fed. R.Civ.P. 23(e)(2). The settlement process depends on compromise, and the objectors cannot expect U.S. Steel to give up $4.45 million dollars, based on conduct

since 2003, while leaving class members free to turn around and sue the next day for the same conduct. The release reasonably balances U.S. Steel's interest in resolving the claims and the public interest in protecting River Rouge and Ecorse residents from future harmful emissions.

### B.

■ Neither have the objectors made the case that the agreement is a product of collusion. *See Williams v. Vukovich,* 720 F.2d 909, 921 (6th Cir.1983). The duration and complexity of the litigation, to start, undermines the objectors' suspicions. The parties litigated for almost four years before reaching a settlement agreement. The court fielded numerous contested pretrial motions. Class Counsel pursued multiple avenues to gather evidence—from consulting with Michigan environmental authorities to conducting numerous substantive depositions. And the agreement itself was a product of months of supervised negotiations, two facilitated mediations and a settlement conference with the court. It is difficult to maintain that Class Counsel took all of these steps merely to mask its collusion with U.S. Steel, and that the one entity with a bird's eye view of the proceedings—the district court judge—somehow missed the signs that the parties were merely engaged in pretense and posturing.

The objectors also see evidence of collusion where it does not exist. The scope of the release, as we have shown, is not as far reaching as the objectors claim and will not give U.S. Steel a blank check to pollute anew. And releasing a continuing-nuisance claim that the plaintiffs included in their original complaint likewise does not demonstrate collusion. *See Olden,* 294 Fed.Appx. at 220.

Revisions to the settlement agreement that purportedly occurred "without the advice, consent or knowledge of the Class Representative" and that the court approved before notifying the class, Moulton Br. 24, also do not demonstrate collusion. By narrowing the release to future continuing-nuisance claims arising out of pre-settlement conduct, as the targeted changes did, the court and parties *responded to Moulton's objections.* A revision that makes an agreement more favorable to class members, whether or not it occurred with the approval of the class representatives, does not establish collusion.

The objectors argue further that the agreement is collusive because "the Class Representative had no input whatsoever" on its terms. Moulton Br. 29. No doubt, "[t]he specter of collusion" arises "in every situation where class counsel ... negotiate[s] settlement terms without meaningful oversight by the class representative." *Olden,* 294 Fed.Appx. at 219 (citation and quotation marks omitted). But that apparition vanishes here because the objectors offer no evidence that Class Counsel excluded them from settlement discussions, much less that they did so for collusive reasons.

### C.

■ That leaves the $4.45 million settlement, which the agreement distributes as follows: $300 to each covered member of the class, limited to one award per household; $10,000 to the seven class representatives; and $1.335 million in attorney's fees (thirty percent) and $622,279.86 in costs to class counsel. Any residual, the agreement says, goes to the River Rouge and Ecorse public schools. Because class counsel received 4,026 class-member claims, roughly $1.21 million will go to the claimants and roughly $1.28 million will go to the schools.

The objectors first argue that class-member awards of $300 are unconscionably low. But that objection is based on the misconception that the agreement releases *all* future tort claims. Having conceded that $300 would be sufficient "to release U.S. Steel from the future consequences of its pre-release conduct," Moulton Br. 27, which is what the release purports to do, this contention goes nowhere. (Nor, it deserves mention, do the objectors or any other party protest the differential between the $300 allotted to each class member and the $10,000 allotted to each class representative.)

■ The thirty percent attorney's fee award, they add, is too high, claiming that it "will exceed the recovery of the Class by over $100,000.00." Moulton Br. 32. But this estimate is wrong: The objectors focus on the amount *claimed* rather than the amount *allocated*. Claimants, it is true, will in the aggregate receive less than Class Counsel. But that is because just 4,026 class members submitted claims. Except for fees and costs, class members had the first shot at the settlement proceeds—nearly $2.5 million by our estimate—which exceed the amount paid to Class Counsel by some measure. That the public schools will receive $1.28 million in *unclaimed* funds does not reflect on the settlement's fairness.

■ Although we disagree that the attorney's fee award on its face is unreasonable, we find merit in one argument: that the district court did not adequately explain its reason for approving the amount. We give great deference to district courts when reviewing an attorney's fee award. *Paschal v. Flagstar Bank*, 297 F.3d 431, 433–34 (6th Cir.2002). And in common-fund cases, we require "only that awards of attorney's fees" "be reasonable under the circumstances." *Rawlings v. Prudential–Bache Properties, Inc.*, 9 F.3d

513, 516 (6th Cir.1993). But for us to review, even deferentially, a district court's "exercise of discretion," we must have something to go on—a district court's reasons for "adopting a particular methodology and the factors considered in arriving at the fee." *Id.* at 516. Often, but by no means invariably, the explanation will address these factors: "(1) the value of the benefit rendered to the plaintiff class; (2) the value of the services on an hourly basis; (3) whether the services were undertaken on a contingent fee basis; (4) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others; (5) the complexity of the litigation; and (6) the professional skill and standing of counsel involved on both sides." *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 780 (6th Cir.1996).

Yet here the district court's only on-the-record explanation was this: the "attorney fee percentage [is] fair and reasonable considering the several years of litigation." ROA 1994. Although an affidavit attached to the parties' joint motion for settlement analyzed the reasonableness of the award using the six factors described above, nothing in the record suggests that the district court incorporated this analysis into its final ruling on the settlement. We thus remand the award's reasonableness to the district court for further explanation.

### III.

Attorney Hadden, on behalf of roughly 300 clients, separately raises several other challenges. Throughout the litigation, indeed even now, the parties have disputed which, if any, class members Hadden represents. But we need not count heads, or determine whether he properly represented any potential members of the class, because we deny Hadden's objections in full.

## A.

Hadden first objects to the district court's denial of his motions to appear on behalf of class members, claiming that the district court violated Rule 23(c)(2)(B)(iv) of the Federal Rules of Civil Procedure by limiting his involvement in the lawsuit. Rule 23 requires class members to receive notice that they "may enter an appearance through an attorney if [they] so desire[ ]." Fed.R.Civ.P. 23(c)(2)(B)(iv). Hadden concedes that the court-approved notice gave class members this option. While the district court later denied Hadden's motion to enter an appearance, the ECF docket lists Hadden as counsel (and has done so for more than two years), our courts continue to accept his filings and the district court permitted him to speak at the final fairness hearing. Class members who wanted Hadden to make an appearance on their behalf have received just that.

 The district court also did not err by corralling the extent of Hadden's involvement in the case. Along with the notice provision on which Hadden relies, Rule 23 gives the district court broad discretion in handling class actions, authorizing "orders that ... impose conditions on the representative parties or on intervenors." Fed.R.Civ.P. 23(d)(1)(C). In view of Hadden's ethically questionable communications with litigants—his unannounced ·solicitation of opt outs and his guarantee that individuals receiving his letter would be his clients whether they stayed in or opted out—the district court appropriately exercised its discretion. The district court has "a substantial interest in communications that are mailed for single actions involving multiple parties" and may counter "misleading communications ... by court-authorized notice." *Hoffmann–La Roche Inc. v. Sperling*, 493 U.S. 165, 171, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989). The district court's solution—deny Hadden's motion, provide the affected litigants an extended opt-out period to sort out exactly who wanted Hadden to represent them and who wanted to opt out, *then* permit Hadden to "take appropriate action" with respect to his clients, ROA 1310–11—was at the very least a reasonable way, if not an essential way, to unwind the confusion Hadden had caused. *See Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981).

Hadden sees it differently, insisting that the court improperly shut him out of the case. In support, he points to off-the-cuff remarks the district court made at the hearing on the propriety of Hadden's communications with class members, expressing frustration over Hadden's attempts to "poach[ ]" clients and "interlop[e]" in the suit. Hadden Br. 20. What Hadden fails to mention, however, is that the court's subsequent order on his motion "[r]eflect[ed] on what the Court stated at the hearing" and clarified that Hadden would not be permanently foreclosed from representing whichever clients had, in fact, retained him. ROA 1309–10. The district court also contemplated that Hadden would have a future role in the suit. After the extended opt-out period, it suggested that Hadden gather up whichever of his clients opted out and either move to intervene in the suit or file a separate suit, which the court could then consolidate with the class action.

Hadden says that was not enough—that he should have been permitted to represent class members and opted-out individuals simultaneously. Yet he fails to come to grips with the reality that this kind of dual representation likely would have run up against Michigan's ethics laws. In Hadden's letter soliciting opt-outs, he essentially promises class members that opting out will result in "a much higher settlement than is paid to the general

population." ROA 1118. Having made this promise, Hadden would have created an ethical quagmire had he represented class members and opted-out individuals, given the "substantially different possibilities of settlement of the claims." Mich R. Prof. Conduct 1.7 cmt. Given the precarious situation that Hadden created through his own conduct, the district court's solution reasonably balanced the interests of the clients who wanted Hadden's representation and Michigan's attorney-ethics rules.

Hadden, lastly, waived any federal constitutional complaints about the district court's handling of his attempts at representation by raising them for the first time in his reply brief. *Thornton v. Graphic Comm. Conf. of the Int'l Bhd. of Teamsters Supp. Ret. & Disab. Fund,* 566 F.3d 597, 616 n. 18 (6th Cir.2009).

## B.

 Hadden separately argues that the district court had a duty to open another "opt-out opportunity" for his clients "after the terms of the proposed settlement were published." Hadden Br. 28. Not so. Although district courts *"may* refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members," Fed.R.Civ.P. 23(e)(4) (emphasis added), they are not compelled to do so. *Denney v. Deutsche Bank AG,* 443 F.3d 253, 271 (2d Cir.2006); *see also* Fed.R.Civ.P. 23(e)(3), advisory committee's note to 2003 amends. Hadden's clients, at any rate, received a second opt-out opportunity. What he wants is a *third* one, which the district court permissibly denied.

Hadden's claim that the district court should have required correction of a "clerical error" that omitted 34 class members from the final opt-out report meets a similar fate. Hadden Br. 23. At no point has Hadden offered evidence on the record that the 34 "missing" opt-out forms were mailed to Class Counsel. Lacking any evidence that these class members opted out, Hadden cannot demonstrate that an error occurred, much less that the district court abused its discretion by not correcting it. *See Lindsey v. Memphis–Shelby Cty. Airport Authority,* Nos. 99–5159, 99–5162, 2000 WL 1182446, at *7 (6th Cir. Aug.15, 2000).

## C.

We also reject Hadden's claim that the district court abused its discretion by not accepting opt-out forms that Hadden signed, purportedly at his clients' request. We have serious doubts at the outset whether these clients requested that Hadden sign their form, or if they merely failed to respond to Hadden's letter—triggering Hadden's "automatic" opt out on his terms. Even setting this skepticism aside, we find none of his arguments persuasive.

 Looking first to the federal rules, Hadden directs us to Rule 11(a), which requires that an attorney sign "every pleading or other paper filed in a case." Hadden Br. 25. From this, he concludes, "an opt-out notice may be signed by the attorney, not the client." *Id.* He misunderstands. Rule 11, which requires attorneys to act in good faith when making formal submissions to the court, has no relevance here, where the individual signing the form acknowledges personal assent. If Hadden were correct, not only would all of the individually signed opt-out forms be invalid, so would every other personally signed paper lodged with a court: wills, plea agreements, affidavits, etc.

Hadden persists, pointing to an Eighth Circuit case that looked favorably on at-

torney-signed opt-out forms. *See In re Gen. Am. Life Ins. Sales Practice Litigation*, 268 F.3d 627, 634–35 (8th Cir.2001), *vacated on other grounds by Henderson v. Gen. Am. Life Ins. Co.*, 536 U.S. 919, 122 S.Ct. 2584, 153 L.Ed.2d 773 (2002). But he cites no case, nor have we found any, that *requires* district courts to accept opt-out forms signed by attorneys. To impose such an unbending rule would unduly interfere with the district court's "broad authority" to manage class actions by "governing the conduct of counsel and the parties." *See Gulf Oil Co.*, 452 U.S. at 100, 101 S.Ct. 2193. Due to Hadden's letter, the district court (quite understandably) sought to stem confusion over who wanted to opt out of the suit. Given the real risk that the attorney-signed opt-out forms did not reflect the wishes of class members, the district court appropriately exercised its power by requiring individually signed opt-out forms (and rejecting the attorney-signed forms). *See In re McKesson HBOC, Inc. Securities Litig.*, 126 F.Supp.2d 1239, 1246 (N.D.Cal. 2000); *Georgine v. Amchem Prods., Inc.*, 160 F.R.D. 478, 501 n. 43 (E.D.Pa.1995).

The Michigan Constitution's guarantee of "the right to prosecute ... [a] suit ... by an attorney," Mich. Const. Art. I, § 13, does not save his argument. The Hadden clients who opted out of the suit had an attorney: Hadden. And those who remained in the class were adequately represented by court-approved Class Counsel.

## IV.

For these reasons, we affirm in part, vacate the district court's approval of the attorney-fees award and remand the fees issue for further consideration.